# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SUZANNE D. COYNE,

     Plaintiffs,

vs.                                    Case No. 15-cv-54 SCY/KBM

LOS ALAMOS NATIONAL SECURITY, LLC,
NICHOLAS DEGIDIO, and GAIL MCGUIRE,

     Defendants.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

The ultimate goal of our civil justice system is to determine what is true and then apply law to that truth to obtain a just resolution of the conflict at issue. Recognizing that factual disputes exist, the system presumes that the honest exchange of information, combined with the adversarial process, will allow truth to reveal itself to the factfinder. Thus, the system's foundation is built on the idea that parties to a dispute will honestly exchange information. Given the importance of this honest exchange, the system demands harsh sanctions against those who seek to defeat its truth-seeking function by engaging in willful, bad faith conduct designed to deprive the opposing party of relevant information related to the claims at issue. The Court, unfortunately, is presented with an instance in which a party has engaged in such willful and bad faith conduct. In her Proposed Findings and Recommended Disposition (PFRD), Chief Magistrate Judge Karen B. Molzen recommends that the Court dismiss with prejudice Plaintiff's lawsuit as a sanction for this conduct. Doc. 146. The Court has considered the written submissions of the parties, the record in this case, the applicable law, and the PFRD. The Court has further conducted a de novo review of those portions of the PFRD to which objections have

1

been made. The Court rejects Plaintiff's Objections to Proposed Findings and Recommended

Disposition (Doc. 147) and, pursuant to 28 U.S.C. § 636(b)(1), adopts the PFRD, incorporating it

in full. Thus, for the reasons stated below and in the PFRD, the Court grants Defendants'

Motion for Dismissal with Prejudice as Sanction for Plaintiff's Willful Destruction of Evidence.

Doc. 136.[1]

## I. <u>Background</u>

Plaintiff Suzanne Coyne alleges that she began working for Defendant Los Alamos

National Security, LLC ("LANS") in 2003. Doc. 1, Ex. A ¶ 9. Plaintiff claims that in December

2011, one of her co-workers, Jackie Little, entered her office "advanced on Ms. Coyne backing

her against her desk and started screaming at her . . . raised her arms and began jabbing her

fingers close to Ms. Coyne's face while continuing to scream at her." *Id.* ¶ 12. Ms. Coyne asserts

that she immediately reported this incident to the Human Resources Department and to her

supervisor, Defendant Gail McGuire. *Id.* ¶¶ 13-15. According to Plaintiff, however, Defendant

McGuire took no action to address Ms. Coyne's concerns about Ms. Little. *Id.* ¶ 20. In January

2012, Ms. Coyne sought medical treatment for her workplace-induced anxiety and eventually

took time off work under the Family Medical Leave Act ("FMLA"). *Id.* ¶¶ 28-29. When she

returned to work in February 2012, Plaintiff states Defendant McGuire and Defendant Nicholas

Degidio informed her that she was being removed from her prior position and transferred to a

new office. *Id.* ¶¶ 34-35. Later, in March 2013, Ms. Coyne was fired. *Id.* ¶ 58.

On December 11, 2014, Ms. Coyne and her husband brought suit against Defendants for

their alleged mistreatment of Ms. Coyne as an employee. Plaintiffs' complaint contains ten

counts (some of which are not asserted against all Defendants): breach of contract, breach of the

---

[1] The parties consented to the exercise of jurisdiction by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c). Docs. 10-14.

implied covenant of good faith and fair dealing, an FMLA claim, a state law retaliation claim, an all-purpose negligence claim, a tortious interference with contract claim, a state law wrongful termination claim, an intentional infliction of emotional distress claim, an assault claim, and a claim for loss of consortium. *See generally id.*

On April 20, 2015, the Court dismissed Count VII of the Complaint with prejudice and, with regard to the individual Defendants only, Count IV of the Complaint. Doc. 24. On February 20, 2016, Defendants filed a motion to amend their answer to assert the affirmative defense of after-acquired evidence. Doc. 60 at 3.  This affirmative defense is predicated on evidence that Plaintiff repeatedly used her Laboratory work space and computer, while at work for Defendant LANS, to do work for her husband's private counseling business, which included disclosing private, protected health information about her husband's counseling patients. Doc. 60 at 2-3. The Court granted Defendants' motion on June 24, 2016 and Defendants filed their amended answer on June 27, 2016. Docs. 89, 91.

With regard to discovery disputes, on February 29, 2016, the Court granted in part Plaintiffs'[2] Motion to Compel and ordered Defendant LANS to provide certain information in response to various interrogatories. Doc. 64 at 12.  Having denied other aspects of the Motion, however, the Court required the parties to pay their own respective attorney's fees.  Aside from this instance, the remaining discovery disputes in this case involved Plaintiffs' repeated failures to comply with their discovery obligations. These failures ultimately resulted in the award of attorney's fees and other sanctions imposed against Plaintiffs.

On March 10, 2016, the Court granted in part a motion to compel filed by Defendant LANS.  Plaintiff's husband, who was a party at the time, had refused to provide discoverable

---

[2] Although Mr. Coyne has been dismissed as a party from this lawsuit, the Court refers to Plaintiffs – plural – when providing the background of events that occurred while Mr. Coyne was still a party.

documents or answer certain questions during his deposition. Doc. 70.  In addition to granting the Motion with regard to Mr. Coyne, the Court ordered a second deposition at his expense so that he could answer relevant questions he had previously refused to answer. Doc. 70 at 3-7. With regard to Plaintiff, the Court ordered that she produce certain "LANS system email communications and complete privilege log accounting for all other communications between herself and her counsel while she was employed by LANS . . .." Doc. 70 at 6-7.  Finally, the Court determined that "Plaintiffs [had] refused to comply with Defendant LANS' discovery requests even after extensive good-faith efforts were made to secure them and none of Plaintiffs' objections were substantially justified." Doc. 70 at 15.  As a result, the Court ordered Plaintiffs to pay Defendant's reasonable attorney's fees and costs incurred in bringing the Motion. Doc. 70 at 16.

On June 29, 2016, the Court issued an Order on Defendants' Motion to Strike Expert Witness and for Sanctions (Doc. 79). Doc. 94.  In the Motion, Defendants represented that Plaintiff (but not her attorney) had informed her mental health counselor, who she had declared as an expert witness, that she would not actually have to testify. Doc. 94 at 2-3.  Defendants, unaware of Plaintiff's communication, paid to depose the expert only to discover that the expert was unable to provide any opinion as to Plaintiff's current emotional or psychological state. Nor could the expert use her treatment notes to provide an opinion as to Plaintiff's emotional and psychological state at the time of treatment. Doc. 94 at 3.  As a result, Defendants asked the Court to bar the witness from giving expert testimony and to award attorney's fees and costs incurred as a result of Plaintiffs' "inaccurate and misleading" disclosure of the counselor as an expert witness. Doc. 94 at 3.  The Court sympathized with Defendants' legitimate frustration but ultimately denied Defendants' Motion largely because the counselor's treatment notes contained

information that could potentially be admitted despite the witness's lack of memory. Doc. 94 at 5.

Less than two weeks later, on July 7, 2016, Defendants filed their Motion for Sanctions for Failure to Obey Discovery Order based on Plaintiffs' failure to pay the previously ordered sanctions or to provide documents as the Court ordered on March 10, 2016. Doc. 97. Defendants also complained about the difficulty they were having obtaining appointment calendars and billing records related to Mr. Coyne's business. Doc. 97 at 3-10. They noted that Plaintiffs failed to produce this information in response to their discovery request, required them to file a motion to compel, failed to then produce the information by March 24, 2016 as the Court ordered, and still had not produced it before Mr. Coyne's second deposition. Doc. 97 at 3-8. Further, Defendants noted that Plaintiff Suzanne Coyne testified during her deposition that she handles her husband's billing records. Doc. 97 at 3-8. The records she brought to her June 14, 2016 deposition, however, did not cover all relevant years. Doc. 97 at 3-8. In their Reply filed on August 2, 2016, Defendants argued that Plaintiffs' failure to produce appointment books for 2014 and 2015 on the basis that they "cannot find" them constituted spoliation. Doc. 103 at 2. Defendants also asserted that "Plaintiffs' recent production of additional pages from Mr. Coyne's 2013 appointment book have only compounded the problem and raise serious questions about the authenticity of these documents, as **many of the pages from the most recent set of 2013 entries are markedly different from the entries for the *exact same dates* in 2013 that Plaintiffs previously produced."** Doc. 108 at 2 (emphasis in original). During an August 12, 2016 hearing on the matter, the Court expressed concern about the discrepancies in the appointment calendars produced, agreed that Defendants deserved an explanation that would

now require a third deposition of Plaintiffs, and found it "very troubling" that Plaintiffs claimed that could not find otherwise discoverable appointment books. Doc. 112 at 3.

Defendants further noted that Plaintiff failed to supplement her initial disclosures by providing text message communications with her psychiatrist. Doc. 97 at 10.  Defendants noted that Plaintiff failed to produce or identify this information in discovery and, when her cellular telephone was examined during her June 14, 2016 deposition, it appeared that those messages had been deleted. Doc. 97 at 10.  Defendants further noted that, inconsistent with her deposition testimony that she and her husband were experiencing financial stress and struggling to make ends meet, Plaintiffs were able to come up with a $10,000 cash only bond to get Mr. Coyne out of jail (although Mr. Coyne swore that his son paid the bond with money the son borrowed) and purchase a new Harley Davidson motorcycle. Doc. 97 at 9, 14, 97-8 at 3.  On August 12, 2016, the Court granted most of Defendants' requested relief, including ordering Plaintiff and her husband to pay the costs and fees associated with their second deposition as well as the cost and fees associated with a third deposition for each of them. Doc. 111 at 2.

Asserting that they had been unable to obtain sufficient evidence to quantify Mr. Coyne's loss of consortium damages, Plaintiffs filed a motion to amend their Complaint to dismiss Mr. Coyne's loss of consortium claims (Count X). Doc. 116 at 4-5.  Although Defendants did not oppose the dismissal of Count X, they argued that the dismissal should come with consequences. They argued that Mr. Coyne knew his claim was meritless when he filed it, that Defendants spent "thousands of dollars chasing down the evidence", and that Plaintiffs should have to pay the fees and costs Defendants expended in defending against Mr. Coyne's claim.  Doc. 120 at 1. The Court dismissed Count X of the Complaint and granted Plaintiffs' motion to file an amended

complaint. Doc. 134 (filed 1/5/17).[3]  In so doing, the Court summarized Mr. Coyne's repeated

failures to comply with his discovery obligations and agreed with Judge Molzen's decision to

impose sanctions in response to those repeated violations. Doc. 134 at 3-5.  Because Judge

Molzen had already issued sanctions for these discovery violations, however, the Court declined

to issue additional sanctions for these same violations.  Doc. 134 at 6.  Further, while

acknowledging that Defendants had a legitimate basis for frustration, the Court also declined to

take the "extreme" action of imposing sanctions under 28 U.S.C. § 1927, which allows a court to

sanction a party who unreasonably and vexatiously multiplies the proceedings in a case. Doc.

134 at 4-6.

On November 9, 2016, Defendants filed their Second Motion to Compel Discovery in an

effort to have the Court compel Plaintiff to submit her phone for forensic testing. Doc. 127.

Defendants noted that Plaintiff had acknowledged exchanging text messages with her husband

and psychiatrist but that she allowed those messages to be deleted from her phone. Doc. 127 at 3-

4.  Plaintiff claimed that she did not realize she had a duty to preserve those text messages and

that her phone was set to delete text messages every thirty days. Doc. 127 at 4.[4]  The text

messages at issue were subject to disclosure pursuant to Defendants' discovery request that

Plaintiff provide all text messages that "relate in any way to any of the allegations contained in

the complaint." Doc. 127 at 2 (internal citations and quotations omitted).  During a December 16,

2016 hearing on the Motion, Defendants noted that they were looking for text message

---

[3] Although the Court granted Plaintiff leave to file an Amended Complaint, the parties agree that the time
to file the Amended Complaint should be extended until after resolution of the present motion to dismiss.
Doc. 143.
[4] Defendants later point out that, as of September 17, 2014, the iPhone operating system default is to
"Keep Messages" "Forever." Doc. 144 at 9.  Therefore, if Plaintiff's explanation that messages after this
date were automatically deleted every thirty days is true, in spite of her obligation to preserve evidence,
Plaintiff must have purposefully changed the default setting on the phone from never delete to delete
every thirty days. Doc. 144 at 9.

communications Plaintiff had with her husband and with her psychiatrist from December 2011

forward. Doc. 132 at 2. Defendants agreed that Plaintiff had cooperated with other attempts to

retrieve her text messages. Doc. 132 at 2. Plaintiffs, who had not (and still have not) paid the

previous Court-imposed sanctions, argued that they did not have the financial resources to pay

for the forensic examination. Doc 132 at 3. They conceded, however, that neither had they sold

the recently purchased Harley Davidson motorcycle. Doc. 132 at 3.

In the Court's Order on Defendants' second motion to compel, the Court noted that the

recovery of text messages "could have a significant impact on the pending emotional distress and

loss of consortium damages claims" and opined, "[c]learly that is why Defendant LANS

continues to seek their production." Doc. 133 at 4. In acknowledging one clear reason

Defendants sought the text messages, however, the Court in no way limited the use or discovery

of text messages to that purpose. Further, with regard to who would be required to pay for the

forensic examination, the Court noted, "[t]here is no indication that Mrs. Coyne deliberately

erased the messages because they will likely benefit Defendants' case[.]" Doc. 133 at 5, n.4.

Nonetheless, the Court required Plaintiff to split the cost of the forensic examination because she

"was on notice of their importance but failed to preserve them by simply changing the setting on

her phone to prevent automatic deletions over time." Doc. 133 at 5. Importantly, at the time the

Court entered this Order it had no indication that Plaintiff deliberately erased the messages. As

set forth below, however, Plaintiff's most recent actions now provide such an indication.

## II.   <u>Conduct at Issue</u>

The facts set forth in the previous section provide the backdrop for Defendants' Motion

for Dismissal with Prejudice as Sanction for Plaintiff's Willful Destruction of Evidence. Doc.

136. Specifically, Defendants present evidence and allege that, after the Court ordered Plaintiff

to submit her iPhone to Defendants for forensic testing, Plaintiff intentionally destroyed all data from the phone for the purpose of preventing Defendants from obtaining information relevant to the case. Accordingly, Defendants contend that the Court should dismiss Plaintiff's suit with prejudice. In her PFRD, Judge Molzen agreed. Based on the self-serving affidavits Plaintiff and her husband filed, Plaintiff objects to Judge Molzen's conclusion that there is "overwhelming . . . evidence that she deliberately destroyed [information] on her iPhone to assure that any potentially negative text messages were not retrievable during the impending forensic examination." Doc. 147 at 2 (citing PFRD, Doc. 146 at 10). Plaintiff, however, acknowledges that she "is unable to offer any alternative explanation for the loss of data from the phone." Doc. 147 at 1.

The Court easily concludes that Defendants have presented more than clear and convincing evidence to support their contention and Judge Molzen's conclusion that Plaintiff deliberately erased data from the phone. The same day Plaintiff presented her phone to her attorney for testing, someone accessed Plaintiff's phone with the proper user passcode and/or Apple ID and password, selected the "erase and reset" option, and then confirmed the decision to erase and reset. Doc. 146 at 6 (citing Doc. 136-11 at ¶ 8); *see also* Doc. 136 at 10. Two minutes after the phone was erased and reset, someone accessed the phone using a wireless network from a restaurant located across the street from where Plaintiff resides. Doc. 144 at 4 - 6 (citing forensic examination results). Twenty minutes after the phone was erased and reset, someone manually dialed (because the contacts had just been erased) Plaintiff's husband from the cell phone. *Id.* Who else could have done this? The phone was not stolen – Plaintiff turned it over to her attorney six hours later. Further, no evidence exists that the phone was hacked. And the forensic examiner could not have done it because it happened before the forensic examiner

obtained the phone.  Additionally, Plaintiff had the motive to do it, Plaintiff had the opportunity

to do it, and Plaintiff (and likely only Plaintiff) had the means to do it because she possessed

both the phone and the passwords necessary to access the erase function on the phone.  It defies

belief that anyone other than Plaintiff erased the data on the phone just hours before Plaintiff was

forced to hand it over to her attorney so that it could be searched for information harmful to

Plaintiff's case.  It is therefore not surprising that Plaintiff is unable "to offer any alternative

explanation for the loss of data from the phone." Doc. 147 at 1.

### III.   <u>Appropriate Sanction for Conduct at Issue</u>

Defendants seek dismissal of Plaintiff's claims under Federal Rule of Civil Procedure 37.

They begin by arguing that Plaintiff destroyed evidence that she had a duty to preserve. Doc. 136

at 15.  Pursuant to Rule 37(e)(2)(C), "upon finding that a party acted with the intent to deprive

another party of the information's use in the litigation [a Court] may . . . dismiss the action or

enter a default judgment." Fed.R.Civ.P. 37(e)(2)(C).  Defendants also assert that Plaintiff failed

to comply with a Court order and failed to disclose discoverable information. Doc. 136 at 17-18,

21-22.  Dismissal is also a potential sanction for these violations pursuant to Rules

37(b)(2)(A)(v) and 37(c)(1)(C).  Regardless of the specific violation, however, the Tenth

Circuit's decision in *Ehrenhaus v. Reynolds* guides this Court's determination of whether to

dismiss Plaintiff's lawsuit. 965 F.2d 916, 920-21 (10th Cir. 1992).

In *Ehrenhaus*, the Tenth Circuit identified five factors that a district court should consider

in deciding whether to exercise its discretion to issue a judgment against a party for discovery

violaitons: (1) the degree of actual prejudice caused by the disobedient party; (2) the amount of

interference with the judicial process; (3) the culpability of the litigant; (4) whether the court

warned the party in advance that a default judgment would be a likely sanction for non-

compliance; and (5) the efficacy of lesser sanctions. 965 F.2d at 921.  Ultimately, "the chosen sanction must be both just and related to the particular claim which was at issue in the order to provide discovery." *Id.* at 920.

### A. Relationship between the Discovery Violation and Plaintiff's FMLA and Retaliatory Discharge Causes of Action

Faced with insurmountable evidence that she intentionally deleted the data on her phone, Plaintiff attempts to cut her losses by focusing on this latter *Ehrenhaus* requirement that the chosen sanction be related to the particular claim at issue in the order to provide discovery. Specifically, she asserts that her "claims for violations of the FMLA and LANS's policies are not dependent upon any communications [Plaintiff had] with her husband or with her psychiatrist." Doc. 147 at 8.  This is because her phone was to be examined for the purpose of recovering text communications with her husband and psychiatrist and, she asserts, the above claims "are not impacted by the loss of text messages from her cell phone." Doc. 147 at 10.

A later Tenth Circuit decision, however, undercuts Plaintiff's contention. In *Garcia v. Berkshire Life Ins. Co. of America*, the Tenth Circuit indicated that materiality and relevance can be presumed when the discovery violation involves willful fraud. 569 F.3d 1174 (10th Cir. 2009). The plaintiff in *Garcia* falsified or fabricated at least four documents.  *Id.* at 1177.  The Tenth Circuit noted with regard to the first *Ehrenhaus* factor that

> [t]he submission of false evidence substantially prejudices an opposing party by casting doubt on the veracity of all of the culpable party's submissions throughout litigation. The prejudiced party is forced either to attempt independent corroboration of each submission, at substantial expense of time and money, or to accept the real possibility that those discovery documents submitted by the opposing party are inaccurate. Nor is the exclusion of the fabricated evidence always enough to deter discovery misconduct. Litigants would infer that they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues.

*Garcia*, 569 F.3d at 1180 (internal quotation and citation omitted). The Tenth Circuit further noted that an explicit warning that dismissal would be a likely sanction is not a prerequisite to the imposition of dismissal sanctions, particularly when false answers are given under oath, in which case "additional warnings are superfluous at best." *Id*. at 1180 (internal quotation and citation omitted).

The present case presents a similar situation. Plaintiff intentionally destroyed evidence the Court ordered her to turn over and, in filing an affidavit the Court finds to be false, has attempted to deceive the Court through fabricated evidence.[5] The *Garcia* panel noted that the conduct in *Ehrenhaus*, which involved a party's failure to appear at a deposition rather than a party's submission of falsified evidence or deception of the Court, resulted in dismissal sanctions even though the violations were "arguably less egregious." *Id*. at 1180. Similarly, the conduct in *Ehrenhaus* was less egregious than the conduct in the present case. Accordingly, as a general matter, dismissal is not an unwarranted sanction in these circumstances.

Even so, the plaintiff in *Garcia*, like Plaintiff in the present case, argued that her conduct could not provide a basis for the sanctions requested because the conduct had "absolutely no materiality or relevance to the substantive issues of [this] case." *Id*. at 1180 (internal quotations and citations omitted). The Tenth Circuit gave a frosty reception to this argument:

> As an initial matter, even accepting her factual premise, it is hard to see why her legal conclusion follows. A party's willingness to fabricate evidence bears on character and credibility, which often is broadly at issue in a given case. In addition, when a party willfully submits false evidence, it imposes substantial burdens not only on the opposing party, but also on the judicial system itself, as the extent and relevance of the fabrication are investigated. The lack of "materiality or relevance" is often not apparent until []later in the litigation, when the plaintiff's legal theory is clarified. By then, however, costs will have already been inflicted and the damage done. Moreover, when false evidence or testimony is provided under oath, knowingly and with intent to deceive, a party commits a fraud on the court. It would be odd, therefore, if a court's power to impose the admittedly

---

[5] To be clear, the Court attributes this conduct to Plaintiff, not Plaintiff's counsel.

severe sanction of dismissal depended only on the falsehood's relevance to the parties' claims, and failed to account for the act's interference with the judicial process.

*Garcia*, 569 F.3d at 1181. These statements in *Garcia* indicate that certain deceptive conduct by a party can taint the entire proceedings so severely that it may be presumed that the deception has permeated the whole case. Nevertheless, while indicating that a court might be justified in dismissing a case when a plaintiff willfully attempts to deceive the Court during the discovery process, regardless of whether the deceit relates to a particular claim, the Tenth Circuit stopped short of issuing such a holding. Instead, the Court determined, "we need not decide the question in this case, because we agree with the district court that at least two of Ms. Garcia's fabrications were directly relevant to her claims." *Id*. at 1182.

Plaintiff does not address *Garcia*, but argues that a recent United States Supreme Court decision indicates that a claim cannot be dismissed unless the wrongful conduct relates to the cause of action. Doc. 149 at 2. Specifically, Plaintiff cites the United States Supreme Court's recent decision in *Goodyear Tire & Rubber Co. v. Haeger*, No. 15-1406, 581 U.S. ___ (April 18, 2017). Doc. 149 at 2.[6] In *Haeger*, the Supreme Court rejected a federal district court's decision to award attorney's fees that were not incurred as a result of the wrongful discovery conduct the district court found to justify sanctions. *Haeger*, slip op. at 1. The district court recognized that in the "usual" case "sanctions under a [c]ourt's inherent power must be limited to the amount [of legal fees] caused by the misconduct" but concluded that the case was not usual because "the sanctionable conduct r[ose] to a truly egregious level." *Id*. at 3 (internal quotations

---

[6] Defendants move to strike Plaintiff's Reply to Defendants' Response to Plaintiff's Objections to Judge Molzen's PFRD. Doc. 150. Defendants correctly point out that neither rules nor statute provide for a reply to a response to objections to a PFRD. Doc. 150 at 1. Plaintiff's short Reply, however, focused on the impact of a Supreme Court decision entered after Judge Molzen's PFRD and so essentially functioned as a notice of supplemental authority. Further, prior to receiving Plaintiff's Reply, the Court had already considered this Supreme Court case. Plaintiff's Reply does not alter the Court's decision. As a result, the Court will deny Defendants' motion to strike.

and citations omitted). In unanimously rejecting this rationale, the Supreme Court found that the district court's egregiousness requirement was "wide of the mark." *Id*. at 11.

Although *Haeger* addressed the imposition of sanctions in the form of attorney's fees rather than the dismissal of claims, Plaintiff argues that the Supreme Court's rationale should apply equally to both situations. Doc. 149 at 3. A closer look at the Supreme Court's rationale in *Haeger*, however, undermines Plaintiff's argument. The Supreme Court in *Haeger* began its analysis by distinguishing civil sanctions from criminal sanctions, and by citing to its previous decision in *Mine Workers v. Bagwell*, 512 U.S. 821, 826-830 (1994). *Haeger*, slip op. at 5. It noted that a fee award sanction could be civil in nature if it only "covers the legal bills that the litigation abuse occasioned." *Id*. at 6. "But if an award extends further than that—to fees that would have been incurred without the misconduct—then it crosses the boundary from compensation to punishment. Hence the need for a court, when using its inherent sanctioning authority (and civil procedures), to establish a causal link—between the litigant's misbehavior and legal fees paid by the opposing party." *Id*. While portions of this language no doubt appeal to Plaintiff, the care the Supreme Court took to limit the reach of its decision to punitive "legal fees" prevents Plaintiff from gaining the traction from this opinion that he seeks. This is because the dismissal of a civil claim, unlike the imposition of a punitive fine (disguised as a legal fee sanction in *Haeger*), cannot be considered equivalent to a criminal penalty and, therefore, requires no criminal due process protection.

The Supreme Court essentially said as much in *Bagwell*. There, in distinguishing sanctions that require criminal due process protection from those that do not, the Supreme Court stated:

> Contempts such as failure to comply with document discovery, for example, while occurring outside the court's presence, impede the court's ability to adjudicate the proceedings before it and thus touch upon the core justification for the contempt

power. Courts traditionally have broad authority through means other than contempt—such as by striking pleadings, assessing costs, excluding evidence, and entering default judgment—to penalize a party's failure to comply with the rules of conduct governing the litigation process. *See, e.g.*, Fed.Rules Civ.Proc. 11, 37. Such judicial sanctions never have been considered criminal, and the imposition of civil, coercive fines to police the litigation process appears consistent with this authority.

*Bagwell*, 512 U.S. at 833.  Although the Supreme Court does not explicitly list the dismissal of actions among its examples of non-criminal sanctions, it does note that default judgments "never have been considered criminal." *Id.*  Similarly, sanctions such as dismissal of actions should not require the same criminal due process protections the Supreme Court stated must be given in connection with punitive fines.  As set forth above, the Supreme Court's holding in *Haeger* was premised on its conclusion that the imposition of the fees at issue amounted to a criminal sanction.  Because the sanction in this case does not amount to a criminal sanction, *Haeger* does not mandate the causal connection Plaintiff argues it does.

Of course, while *Haeger* does not *mandate* a causal connection, neither does it compel the opposite conclusion—that no causal connection is required.  It simply does not directly speak to this issue.  The Court, however, like the Tenth Circuit in *Garcia*, does not need to decide this outstanding question because it determines that Plaintiff's willful, bad faith discovery violation relates to Plaintiff's FMLA and retaliatory discharge claims.

The first step in this relation analysis is to consider the FMLA and retaliatory discharge claims at issue.  Plaintiff sets forth allegations in support of her FMLA claims in her March 16, 2015 Response to Plaintiffs' Motion to Dismiss (Doc. 15) and in her Objections to the PFRD (Doc. 147).  The genesis of this claim, she alleges, was Jackie Little's assault on her at work. Doc. 15 at 1, Doc. 147 at 2. Plaintiff claims that she repeatedly reported the assault and demanded action, only to be told to "let it go." Doc. 15 at 2, Doc. 147 at 3.  Her continued insistence for an investigation, she says, caused her work environment to deteriorate. Doc. 15 at

3, Doc. 147 at 3. The stress of this situation, she claims, caused her to take FMLA leave from February 6, 2012 until February 29, 2012. Doc. 15 at 3-4, Doc. 147 at 4. Apparently, however, Plaintiff was not medically cleared to return to work on a full-time basis until June 28, 2012. Doc. 15 at 5. Between her return to part time work on February 29 and her clearance to full time work on June 28, Plaintiff claims that she was moved to a different building where she initially was given nothing to do. Doc. 15 at 4-5, Doc. 147 at 5. Plaintiff then claims that she was later given work very different from the work she performed prior to taking FMLA leave and that she had not been trained to do this new work. Doc. 15 at 4-5, Doc. 147 at 5. She also claims that she received a draft of her mid-year review and that the review "contained a number of negative comments, particularly concerning her reaction to the assault in December 2011." Doc. 147 at 6. Even after she was cleared to work full time on June 28, Plaintiff asserts that Defendant LANS refused to return her to the same or equivalent position she held before taking FMLA leave and, after being told that her performance on her new work was unsatisfactory, she was once again moved. Doc. 15 at 5, Doc. 147 at 6. Plaintiff claims that this upset her and caused her to again take FMLA leave for the rest of the week. Doc. 15 at 5. She claims that when she returned to work she was again moved to a new location and given no work to do. Doc. 15 at 5, Doc. 147 at 6. When she received her yearly performance evaluation on November 7, 2012, she received an "unsatisfactory" rating, and says Defendant Degido told her that her performance and behavior over the past year was "unsatisfactory and unacceptable", that he did not believe her account of the December 2011 assault, and that "she was untruthful, dishonest, and lacked integrity." Doc. 15 at 6, Doc. 147 at 7. Plaintiff says she thereafter continued to report to work even though she was given no work to do. Doc. 15 at 6, Doc. 147 at 7. On March 27, 2013, she "was informed

that her employment was being terminated effective April 26, 2013, pursuant to a Reduction in Force policy." Doc. 15 at 6, Doc. 147 at 7.

Defendants do not dispute Plaintiff's allegation that when she returned from FMLA leave they did not return her to the same, or a substantially equivalent, position. They argue, however, that this action was "based on the employee's own performance and/or behavior, separate and apart from the exercise of FMLA rights." Doc. 148 at 3. Thus, in deciding whether Defendants' asserted motivation for not returning Plaintiff to her original position was pretextual, a jury would be tasked with deciding whether, prior to taking FMLA leave, Plaintiff engaged in behavior that justified moving her to a different position. A jury would also be tasked with determining whether Plaintiff's statements in connection with Jackie Little's alleged assault were dishonest, as Defendant Degido represented during Plaintiff's evaluation, and, if so, whether this dishonesty and issues it created with her co-workers justified moving her into a different position.

Plaintiff has acknowledged (albeit during a later time frame) that she communicated with her husband and psychiatrist about the effect these alleged incidents had on her. Given this acknowledgment, it stands to reason that Plaintiff also communicated to her husband and psychiatrist about what was going on at work and how those events were affecting her at the time they were happening. Although Plaintiff had a different phone at the time, the Court agrees with Defendants that it is common for a person to transfer data from an old phone onto a new phone. *See* doc. 144 at 8. Thus, relevant text messages made during late 2011 and 2012 might have been recoverable from Plaintiff's phone had she not wiped it clean before turning it over for forensic examination.

Granted, no one knows whether such text messages *would have* been retrieved from Plaintiff's cell phone. What is known, however, is that Defendants sought text messages that "relate in any way to any of the allegations contained in the complaint" and were willing to pay half the cost of a forensic examination (and front the full cost with no guarantee of being reimbursed) to try and obtain text messages from December 2011 forward. Doc. 127 at 2 (internal citations and quotations omitted). The Court agrees that "Plaintiff's 'intentional destruction of evidence would be rewarded' should the Court hold Defendants 'to a strict standard of proving the destroyed files' content and whether its destruction prejudiced [Defendants'] case.'" Doc. 148 at 3 (quoting *Philips Elecs. N. Am. Corp. v. BC Tech*, 773 F.Supp. 2d 1149, 12012 (D. Utah 2010)). The fact that Plaintiff would take so many deliberate steps to destroy the evidence just before it was forensically examined creates an inference that she knew information detrimental to her case might be recovered during a forensic examination of the phone. Given the events in this case, the Court simply cannot take Plaintiff at her word that none of the deleted text messages relate to her FMLA claim. Indeed, Plaintiff's act of willfully destroying evidence in bad faith and in violation of a Court order deprives her of any benefit of the doubt. The Court therefore assumes that had text messages from late 2011 and 2012 been recovered from Plaintiff's telephone, those text messages, made during the time of the events in question, would directly bear on the factual issues in dispute with regard to her FMLA claim. As a result, the Court rejects Plaintiff's argument that no connection exists between the text messages Defendants sought and her FMLA cause of action.

Similarly, the Court rejects Plaintiff's argument that no connection exists between the text messages Defendants sought and her retaliatory discharge cause of action (Count IV). Although Plaintiff asserted that no connection existed between the discovery violation at issue

and her retaliatory discharge claim, she devotes her entire argument to the FMLA claim.  Like the FMLA claim, however, Plaintiff's retaliatory discharge claim raises a factual dispute over whether Plaintiff's conduct during late 2011 and 2012 provided justification for Defendants to take the actions they took.  Text messages Plaintiff sent during this time frame about what was transpiring directly relate to that factual dispute.  As a result, the Court finds that sanctions for Plaintiff's willful and bad faith discovery violations reach both her FMLA and retaliatory discharge claims.

### B.  Efficacy of Lesser Sanctions

For the most part, Plaintiff does not object to Judge Molzen's analysis of the *Ehrenhaus* factors.  In her conclusion, however, Plaintiff does address the fifth *Ehrenhaus* factor — efficacy of lesser sanctions — by arguing that "alternatives less draconian than dismissal of all her claims" are available.  Doc. 147 at 11.  Plaintiff then offers the alternative sanction of allowing the introduction of "evidence about the alleged deletion of information from the cell phone, together with an appropriate instruction to the jury concerning the implications of such conduct . . .." Doc. 147 at 11-12.  The Court disagrees that such a sanction would adequately address Plaintiff's wrongful conduct or deter future wrongful conduct.

First, to be anything, a sanction must go beyond the status quo. The sanction Plaintiff offers essentially maintains the status quo.  As the case now exists, Defendants already have two potential avenues to present information to a jury about the deletion of information from the cell phone.  First, Plaintiff cannot prove her claim without testifying and, when she does, her credibility, including the baggage related to her recent conduct, becomes fair game.  Second, Defendants could arguably admit evidence that Plaintiff willfully destroyed relevant text messages to demonstrate Plaintiff's consciousness of guilt in support of their contention that

Plaintiff engaged in bad behavior while a LANS employee in 2011 and 2012. Given that information about Plaintiff's destruction of potential text messages is *already* likely to come before the jury, the alternative sanction Plaintiff proposes does little to alter the status quo.

Further, Plaintiff's proposed sanction would do little to deter future wrongful conduct. Plaintiff, together with her husband as a former plaintiff, has already been sanctioned for discovery violations on multiple occasions, amassing a current unpaid sanctions bill in excess of $11,000. Doc. 146 at 12. Despite these sanctions, Plaintiff violated the Court's order by taking a series of deliberate, bad faith steps to destroy evidence in an effort to keep it out of Defendants' hands. And then, rather than admitting her wrongdoing when she got caught, she doubled-down on her bet and submitted to the Court a self-serving affidavit the Court finds to be false. Given this history, the Court does not believe any sanction, short of dismissal, is likely to deter Plaintiff from engaging in future misconduct. Moreover, if this case were allowed to proceed, Defendants, not Plaintiff, would likely continue to incur the costs of any future misconduct in which Plaintiff might engage. For all of these reasons, the Court finds that no sanction other than dismissal of Plaintiff's lawsuit is appropriate.

## IV. <u>Conclusion</u>

**WHEREFORE, IT IS HEREBY ORDERED** that *Defendants' Motion to Strike Plaintiff's Reply in Support of Objections to Proposed Findings and Recommended Disposition*, Doc. 150, is denied.

**IT IS FURTHER ORDERED** that Plaintiff's *Objections to Proposed Findings and Recommended Disposition*, Doc. 147, are overruled and the Magistrate Judge's *Proposed Findings and Recommended Disposition*, Doc. 146, are adopted as the decision of the Court.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE